Please step up and identify yourselves. My name is God. Good morning. Read the stats from the state's attorney's office for the people. Okay. You know our procedure. We may give you some leeway, but just don't decide to be here forever. Okay? Let me proceed. Good morning again, Your Honor. I would ask for five minutes rebuttal, if possible. Thank you. This Court wants to reverse Mr. Jones' conviction because the evidence the jury relied on to reach its verdict was admitted in error. Mr. Jones' trial counsels were ineffective when they failed to litigate a motion to suppress the gun Mr. Jones was seen holding or allegedly seen holding on August 21, 2011. The gun that the state relied on to show that Mr. Jones was the shooter on July 11, 2011, by introducing the expert opinion of a firearm expert, Mr. Hunter, without establishing proper foundation for his opinion. An unsupported opinion that claimed that the cartridges found at the scene of the crime on July 1, 2011, were fired from that gun that was found in August. An opinion that the state bolstered by hearsay claimed that Mr. Hunter's work was verified by, quote, a court-qualified expert that did not testify and was not confronted.  And Mr. Hunter was not present when it was fired. I would ask that the jury rebuttal be rebutted. There wasn't a heck of a lot of objecting going on during that testimony, though, was there? Unfortunately, I was not the attorney at the time, but that goes without saying. Well, I'm sure you would have had a motion to eliminate on it, right? I would assume so, Judge. In terms of the motion to suppress, though, wouldn't you agree that the record is not developed to the extent where we would consider it on direct appeal, but if this were to be denied, maybe on a post-conviction? I actually, Your Honor, think that there's plenty of evidence in this case to show, especially with the state claims, which was lack of standing. You have an individual – well, a police officer in full uniform walking into a yard that he knows is – he admitted that it was the backyard of the house, a place that he is unlicensed to be at unless he is invited on it or has a warrant to be on that uninvited place. He is unlicensed to be on that yard as a police officer who specifically goes on that yard. Well, you don't know whether or not he had a warrant. You don't know what facts brought him to that position that he was making the observations from. And you don't know what the defendant was doing there. You don't know if he lived there. You don't know if he was an invited guest. You don't know what his status is. And don't you need to know all of that for your motion? Well, we do know what the officer was there. He testified. He testified that he was there. And we know your guy was there posing with a couple guns in his hand. Well, we – so that's what the officer claims he saw. There was supposed to be pictures. That's some evidence. Well, there's supposed to be pictures of that pose that somehow CPD lost because there was also a photographer supposedly doing it. So CPD lost these in the inventory somewhere on Holman Square. But what we do know is that we don't know that the officer Smith knew that he was holding a gun. He was taking pictures with what appeared to be guns. But it is known that people hold props. And the reason why you don't know that is because there was no motion and you have no record. Right. But we have enough information to know that the officer walked up on that backyard because he was – he testified to that. So we have that evidence. He testified specifically that he was investigating the noise complaint. Him and his partner stopped on the street, saw a car with three individuals and loud noise. That was all in the transcript, loud noise in the car, and they were drinking beer. As they stopped, a couple of them ran into the house. That's when the officer decided, and that moment only, he decided to go into the backyard because his partner went to the front. Counsel, we've read the record. We know all of this. But the point that we're trying to make here is that you might move on to the next issue because the record clearly is not developed well enough to consider this on direct appeal because there was no motion to suppress. Well, I – thank you, Your Honor. I will move on. I – you can respectfully disagree, which is just fine and dandy. No problem. I do think that there was – that there is absolutely no information. You think that an attorney such as yourself would probably do a really good job of making a record, but that didn't occur here. Your Honor, again, thank you for the compliment, but it is the record that we have here, and the record that we have here clearly indicates that there was no warrant, clearly indicates that the officers walked on – the officer walked onto that backyard and looked through the window just because he wanted to see what was going on in the house with no authority to do so. Moving on to the experts and the lack of foundation, the lower court abused its discretion when it, one, ruled counsel's objection to Keller's – Can I just interject something? Yes. In making this argument, you are relying on a case that's been vacated. Am I correct? Correct. But that case relied on a case that although – Which you can't rely on. Well, but the underlying case was not vacated. People v. Safford? Seriously? Seriously? Twenty-three times that case has been criticized, and one time it was complimented, and that one case was vacated, and you're going to rely on that? Well, I'm relying on that case. You're leaning on a rather slender read. It is an outlier case. I agree with Your Honors. It's a case that came from this particular court. It's a case that relies on the fact that if you look in this case, what the officer said is that as far as Exhibit 8 and 9, which were the cartridges that were supposedly fired from the same gun but no match to a gun, he said, I was able to determine the exhibits were fired from the same gun by examining the individual characteristics. And he says, and I quote, he says, I believe the breech face marks. I believe. There's nothing – And he never explained what breech face marks are. Then he went on and said that in using the sheer mark as well as the breech face marks for comparison purposes of Exhibit 1, he found that Exhibit 4, 5, and 6 were fired from that gun. However, he never even – this is the first time during that opinion that he says sheer marks. We don't even know what sheer marks is. The jury didn't know what sheer marks are. And again, breech face marks, he never explained how, why, or when these – he found that sheer – that the – or how he labored his opinion. Rule 705, the State claims, controls here. Now, I do agree that Rule 705 gives us the control of where – how to look at the expert opinion. However, the rule says the expert must testify in terms of opinion or inference and give reasons thereof. Give reasons thereof. That's within the rule. He has – so the expert never gave reasons thereof, not in the foundation of his qualifications, which was objected to, and not in the opinion that he laid or he provided to the jury as to why he found the match. Just by saying that, I believe it was the breech face marks, and just by saying – using terms that he never explained or laid foundation for, cannot give the expert the credibility of foundation. And that was absolutely objected to. Class characteristics are general characteristics that can be found just by knowing who the manufacturer and what kind of bullet it is. It's the individual characteristics that has to be compared and has to be provided to as an underlying foundational question before you issue an opinion. I'm not saying that he had to go through and say the striation were, you know, in a certain spin or looked in a certain way. I'm – Your Honors, I submit that the expert in the foundational part of his opinion should have explained to the jury so they can make a reasonable – make a reasonable decision at the end whether or not a match was there. Explain what are breech face mark. Explain what are shear marks. That's where the agent – that's where the expert fell far short. Hunter never laid the foundation and explained what these terms mean and how they helped him form an opinion. In addition to that, and on top of that, the – on cross-examination, the – or actually before that, on the direct examination, the expert testified that he was verified by another court-qualified examiner. That was kind of repeated in the same manner in cross-examination. However, on direct – on redirect examination, the State came out and specifically asked a very targeted question and – or a loaded question, no pun intended. They asked, your work was validated as well, correct? And he said, yes. What does that mean? And the expert explained, it was verified by another court-qualified examiner. It wasn't just me. That gives the impression that his work was another court-qualified, which court-qualified is a very – What about that term we like to use on appeal from time to time, forfeiture, in light of the fact that it wasn't objected to in direct examination, brought up in cross-examination, and only came up in the subsequent exam. And you're not arguing plain error here. Well, he did object on the redirect examination. Right. I acknowledge that. But you're not arguing plain error, so I think you've got – you might have forfeiture problems here. Well, what we're arguing here is that the error was not harmless because of the cumulative effect between – of what happened with the way that he made his opinion and the way that then he claimed that it was verified by another court-qualified examiner, Your Honors. And he said – he specifically says, it wasn't just me. So he gives a hearsay – he opened up an issue at that point. And on redirect examination, he opened up a Crawford problem where you cannot confront that person that was not just him, that examined or verified or bolstered his opinion. What was the nature – what was the legal nature of the objection that was made on redirect? Hearsay. Correct. And it is a hearsay problem. Judge. It's a hearsay problem because you cannot – you cannot cross-examine. It's a Crawford hearsay problem. You cannot examine the person that is the court-qualified – the unknown court-qualified examiner that was not just him. And you would agree that Crawford violations are subject to the harmless error analysis, right? And that's what I'm saying. The error was not harmless in this case. And the error was not harmless because of the reasons that there was not proper foundation laid as well. And then when you look at the totality of how this case was tried, Your Honor, and then you have the McNeil grand jury evidence coming into Mr. Jones' jury. In what way did that inculpate your client, that testimony? That was a – I don't think it has to – well, it inculpated my client by – How does it hurt your client? How did it hurt your client? Because there was – they didn't hear the testimony of McNeil. They didn't hear the impeachment of Mr. McNeil. What they read or what they potentially read in that transcript is the fact that McNeil said that there were two shooters, that there were – that he saw an individual shooting Oliphant, and that he saw another shooter shooting, which bolsters Gladney's testimony. Gladney is – certainly is the only witness at trial that testified that he saw or didn't see, we're not too sure, my client shooting at him. Mr. Jones was not involved in the shooting of Mr. Oliphant. Mr. Jones supposedly was only involved in the shooting of Mr. Gladney, who was drunk high and running away from the shooting, said that he didn't see who it is, then said that he did see who it is, then I guess when the public defender went to see him again and question him again, he didn't see what happened again. So – Not all that uncommon. Not all that uncommon, but that's the reason why we have jury instructions saying that such a testimony is highly suspect. This is – an individual like that cannot – cannot carry the day for the state in a case where they have to prove a case beyond a reasonable doubt. A person like that, if you put all aside, if you put the gun or the comparisons aside, that's all that the state had, and then if you add McNeil, McNeil kind of bolsters what Gladney said. If you don't have McNeil, Gladney is the only evidence in this case that the state presented, and that – and his evidence will not carry beyond a reasonable doubt – doubt proof in any manner.  So, in the end, we have to be on the safe side. We have to be on the safe side. But we have to be on the safe side because, you know, Mr. Jones, even in the most slight favorable to the state, no rational jury could have found that Mr. Jones was accountable or worked in concert with Omar Williams in this case, who, by the way, was acquitted. There was no testimony that they ever talked to each other, ever worked together, ever stood next to each other, were part of the same altercation with Gladney in the beginning, or were part of the same altercation that... How can you make that argument based on Gladney's testimony? This is happening simultaneously. There's two shooters. Well, there's one shooter at the beginning, and then Gladney starts running away. Mr. Jones was not standing... Isn't your argument dependent upon completely rejecting as completely incredible Gladney? Excuse me? In order to accept this argument, you have to completely discard Gladney's version of the events that occurred in this case. Well, not necessarily. Just one of them. Well, I suggest that you should, but not necessarily, even if you take... But in order to agree with you, you have to. Well, what you have here... Isn't that the jury's preference? However, what you have here, when Gladney starts running, supposedly that's when Mr. Jones shoots at him. He doesn't go to help Mr. Williams. He's not even standing by Mr. Williams. My understanding from the way I read the transcript is that Mr. Williams was in one side of this parking lot and Mr. Jones was in a different part of that parking lot, and he started shooting. We don't know whether or not Mr. Jones saw Gladney running. Maybe he was... Maybe he believed that he was unreal... I mean, he shouldn't have, but... Were you listening? Is that what you were going to say? Well, I was going to say that he thought that it is a possibility that he thought that potentially he was the target of something. Potentially he sees Mr. Gladney, and there was some testimony that they might not have been friends. Maybe he believed that he was somehow going to be a target of something. There's no evidence that him shooting at Gladney... Maybe he just took an opportunity to shoot at him. Just because he shot at Gladney doesn't mean that he was working in concert with Williams. You have to show some sort of a cooperation in order to be accountable. If two people go and shoot the same person on the street for two completely separate reasons, they are not accountable for each other's actions. It just happened to be... They happened to be at the same time and disliked the same person. It's a coincidence. But this coincidence is very reasonable in this inference, because you had testimony of some sort of animosity between Mr. Gladney and Mr. Jones, supposedly if you believe that version of events. So if Mr. Jones sees Mr. Gladney running away from a clip after hearing shots, it is potentially possible that Mr. Jones took the opportunity to shoot at Mr. Gladney. Not being accountable. There's a lot of cherry-picking of evidence, Counsel. That's what I like to do, Your Honor. You've got a lot of... Be careful walking back. You might slip on some fruit. I hope not. Thank you. May it please the Court, Counsel, I want to start with the argument that the verification evidence was somehow a hearsay problem. Keep your voice up if you could. Thank you. It's not hearsay for three different reasons. First, there's no statement. You need an out-of-court statement offered in court for hearsay. Kellan didn't testify that the other examiner said such and such. At most, we have a kind of an inferential hearsay here, like an indirect hearsay, where maybe defendants assuming that the jury heard the testimony about verification and assumed that some other examiner made a statement. But the Illinois Supreme Court's rejected indirect hearsay. They've said, that's not really hearsay. You need an actual statement in court, and here we don't have one. The second problem is that the verification evidence wasn't offered for truth, and you can see that when you look at how it came out in the trial testimony. First, it's on direct. It wasn't offered to prove that it was false. I mean, it wanted to make him look better, didn't it? It was making him look better by showing the basis for his opinion. Not that it was true, but we know that the basis for opinion can come in even where it would otherwise be hearsay. And he's not saying, believe me, because someone agreed with me. We ask, does your lab require validation? And he says, yes, it has to be verified by another examiner. So he's talking about his procedure. He's talking about all the steps he takes, and verification is just one of those steps. Well, didn't you go into it, didn't the State go into it also on redirect? We did after. And it was just the same, essentially the same evidence that had already come out on direct, which was not objected to. And then on cross, when defendant himself brought it out and said, was this based on your experience and training? And the examiner says, yes, my experience and training and verification. So he's asking that. He's trying to make him look bad by getting at the basis of his opinion. And the examiner says, well, it was also based on this. And then on redirect, he just says, was it validated? Yes. What does that mean? It was verified. So it's really just, it's clearly for basis of opinion. That's the purpose here, not for the truth of the matter asserted. But also, it's just cumulative. Two pieces of evidence have already come out. The jury knew this two other ways before defendant finally objected on redirect. So no statement, not for truth, and, you know, cumulative of evidence defendant himself brought out on cross, which he can't complain about. As for the basis, as for the supposed foundation requirement, there is no requirement for foundation under Rule 705. There's no way to square Stafford with Rule 705. The rule says clearly an expert can testify to an opinion without explaining the underlying facts. And that's what happened here. And, well, I should say the expert did. He did explain his methodology. Defendant's being very nitpicky in saying you should have described these exact breach-based marks. What 705 and the cases interpreting it say is getting into the basis of opinion is a matter for cross. So, you know, counsel didn't ask these specific questions here, but, you know, we can't suggest that's some kind of ineffective assistance. Asking an expert about the basis for the opinion is likely to just make them look better. And so there's a good strategic reason to not do that. But, again, it's counsel's option to bring it out on cross. It's not a foundation requirement. But let's get to the gun and the ballistics, because you have here two defendants. One is found not guilty, and the one that was found guilty, the gun and the ballistics, were, you know, big evidence in that case. So what about your colleagues' remarks in that regard? How they got the gun. Oh, pardon me. Okay. How they got the gun. So this is an ineffective assistance claim, and under Strickland there is a strong presumption that counsel was competent. There is no reason to think that counsel bypassed a legitimate suppression motion here. She did move to suppress defendant's statements, and she did move to keep the cartridge-matching evidence out on the ground that the science wasn't good enough. Surely she considered and had a good reason for not making a Fourth Amendment motion on the gun. It's not our obligation to prove why the search was good, but I can throw out a couple of reasons. But in a case where the gun was found in a washer or a dryer like 12 miles away by a cop in an unmarked car who hurt a party, that wouldn't merit a motion to suppress? Not if there was no good Fourth Amendment basis for it. And this was brought out at the post-trial motion hearing. The judge asked. He used the word standing, but he's getting at the legitimate expectation of privacy. He asked defense counsel twice, how does he have standing here? Meaning, you know, has he got a right to complain about the search of this property? And defense counsel doesn't have an answer. He just says, well, he was holding the gun. He wasn't holding the gun when it was seized. The officer saw him through the back window and then recovered the gun from the washing machine. So that was counsel's opportunity to put the defendant on explain how he had a legitimate expectation of privacy in either the yard or the washing machine. So, for example, if let's say defendant and his friends just decided to throw a party here while the owner of the house was out of town, no one would have a legitimate expectation of privacy. We've also got him standing in front of a window. There's no evidence that you had to be in the backyard to see in that window. If you could be seen from a neighbor's house or an alley, he certainly could have – couldn't have expected to keep his visage in the window with his guns and his hands private. Another possibility is that Smith's partner was affecting a valid of arrest of the man who ran into the house. There's no reason to think on this record that Smith was, you know, just running in the backyard to look for evidence of criminal activity. What the record suggests is that when the officers came up, people were drinking on the sidewalk. One man dropped his beer and ran in. Smith's partner followed that man. We don't know, but if he had reason to arrest him, say he knew he had an outstanding warrant and he tried to arrest him outside and the man ran in, he could have followed him in under hot pursuit. Smith, the record suggests, just went to the backyard to head off that man in case he ran out the back door. That's his likely purpose in going out there. So that would be a reasonableness analysis of whether he could conduct this limited intrusion of going through the backyard, balanced against a strong law enforcement interest in preventing an arrestee from escaping. If that's what was happening, that certainly would have been fine. But, again, we don't know. In the recovery of this weapon, there was no reason for these police officers to believe that these guns had any connection to any other crime. That's absolutely right. Smith said, I saw this as a possession of a weapons case. He arrested a defendant for aggravated UUW. He had no idea this was used in a murder, so that's why it was handled the way it was. Let's see. Oh, there was a mention of some lost photographs. There's no claim on appeal about that, so that's forfeited, and it's too late to bring that up now. I'll move on to, as for the grand jury testimony, the trial court made specific findings. Once that transcript was taken out of the jury room, the judge looked at it, directed the parties to look at it, said, make your best arguments. And the judge made findings. He says, no one is named. There is nothing inculpatory to the defendant here, and so there is no prejudice. Defendant hasn't explained a way around that. Oh, I think he mentioned that, you know, the transcript shows there were two shooters. The jury knew that. Gladney testified there were two shooters. Jason Jones, a security guard who had military experience, testified that he could tell, or he testified that he told the detective that he heard two different caliber of weapons being fired, so you know two shooters from that. And then we have all the physical evidence, all the fired cartridge cases collected at the scene. There's 12 9 millimeters that are matched to the Glock that defendant has when he is found at the house party. And then there's seven 40 Smith & Wesson casings that are all from the same gun, but we don't know which one. So we know, the jury, there was no question there were two shooters.  We have a moment. Oh, as to the sufficiency, you know, the defendants didn't have to talk to each other here. They're both firing at Andre Gladney. That shows a common criminal designed to kill him. And as some of the questioning suggests, the sufficiency analysis presumes that Gladney's testimony is credible. And, of course, it was corroborated again by Jones. The physical evidence at the scene that shows two guns, one of the guns came back to the one that defendant was holding at the house party. There's also Gladney's testimony that Oliphant was shot three times, which matches up with the medical examiner's testimony that he had three gunshot wounds. And then there was also a surveillance video that was played for the jury, and you couldn't make out everything exactly, but you could see flashes coming from two separate parts of the parking lot. So unless the court has questions, I'd ask the court to affirm. I would like to address first the issue of if Officer Smith and the other officers were legally on the premise and in the house. I think there's plenty of evidence here that Officer Smith walked onto the window and decided to call his fellow officers for backup. If he had a warrant, that would not have been the testimony. He would have said, I stayed there and waited for somebody to come back with a warrant so we could walk into the house. He would have said something to the effect of I was waiting there and not just kneeling down and hiding down by the window, and then when I heard the sirens of the other officers arriving, I poked my head back up by the window and saw Mr. Jones walking out of the room and other people running away or scrimmaging away. He didn't say that Mr. Jones was running away. And then he said that he walked to the front and he walked into the house with his fellow officers. There is no testimony that anybody had a warrant. And it's not because they didn't bring out a motion to suppress. Because that is the testimony. During the trial, they would have brought out that there was a search warrant for that house, too. It's not inadmissible. It's absolutely admissible. If that officer had a reason to go into that house that was legal, that was consent, there was a search warrant, this State would have elicited it. Doesn't the defendant still have to have a reason to be in the house? Well, there was testimony that there was a party at the house, just like in Abrams, that there was a party in the house. And I know people versus Abrams is an old case, but it's very similar. The officers walked into a house and arrested people that did not own the house and did not, and they were there only for a party. And the court suppressed all that because the officers had no ---- So you're assuming in your argument that he's an invited guest to the party? I don't think ---- I mean, I think we can make reasonable assumptions. I don't think that he was there threatening anybody with those guns, as the testimony was supposedly. Well, we don't know. We don't know what he was doing there. He was taking a ---- there was testimony that he was being photographed holding two guns in the air, which we didn't know at the time or the officers didn't know. There's some stuff there, okay? There's some evidence there. But it's not like it's fully developed in the way that it could be fully developed in the post-condition. Potentially, correct. But there is enough evidence here, in my opinion, Your Honor, humble opinion, that this ---- that is ---- that shows violations of Fourth Amendment rights. And basically under Kimmelman and Strickland and Henderson, what I have to show is that there was an unargued suppression motion that is meritorious, and I think I showed that. And I have to show that counsel's failure to argue the motion amounted to gross incompetence. The State didn't even bother with that prong in their response because they know that it was gross incompetence. And there is a reasonable probability that Mr. Jones would have been acquitted had the evidence been suppressed. Absolutely, because without the gun, there's no matching of the bullet. And without the matching of the bullet, the only thing that they have left in their hand is Mr. Gladney. That's what it is. And finally, to address what counsel said that with the verification evidence, I don't know for what other purpose the State would ask that question and redirect if it wasn't for the truth of the matter asserted. And People v. Yancey was similar. On the redirect examination testimony, the court qualified examiner there agreed with the opinion of their expert, and the Yancey court said that that is hearsay and that's not allowed. That is bolstering, just like happened in our case here. Your Honor, it was nice to see you all. Thank you very much. Thank you. Thank you for your briefs and thank you for your arguments. Panel change, right? We have a brief panel change. We'll see you in a few minutes for the next panel.